UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GRAND DESIGN RV, LLC,

       Plaintiff,

          v.                           CASE NO. 3:21-CV-25-JD-MGG

THOR INDUSTRIES, INC., et al.,

       Defendants.

**OPINION & ORDER**
**and**
**REPORT & RECOMMENDATION**

At the earliest stages of this patent infringement action, Plaintiff Grand Design RV, LLC has raised serious allegations of unethical pre-suit conduct by Defendants' attorney Ryan Fountain. Specifically, Grand Design contends that Mr. Fountain deliberately obtained Grand Design's privileged and confidential information, fully considered and digested it, and then used it in Defendants' publicly filed affirmative defenses to Grand Design's patent infringement claims. According to Grand Design, Mr. Fountain's conduct created, at the very least, an appearance of impropriety while also violating multiple ethical rules.

In order to protect the integrity of this proceeding, deter future misconduct, and to penalize Defendants for the severity of Mr. Fountain's alleged ethical violations, Grand Design filed its Motion to Disqualify Counsel for Defendants and for Additional Sanctions [DE 24] asking this Court to sanction Defendants by (1) disqualifying Mr. Fountain and his co-counsel, Trevor Gasper, from representing Defendants in this

action, (2) striking Defendants' affirmative defenses that rely on the allegedly privileged and confidential information, (3) prohibiting Defendants from further contacting the source or sources of Mr. Fountain's information as witnesses in this case, and (4) requiring Defendants to reimburse Grand Design for its reasonable costs and fees associated with investigating, preparing, and filing its instant Motion.

The undersigned is authorized to issue an order resolving the nondispositive requests raised in Grand Design's motion under a standing referral pursuant to 28 U.S.C. § 636(b)(1)(A). However, the undersigned will issue a report and recommendation as to Grand Design's dispositive request to strike Defendants' affirmative defenses based upon this Court's referral pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b), and N.D. Ind. L.R. 72-1(b). [DE 30].

## I.   RELEVANT BACKGROUND

The facts outlined below are derived from the parties' briefing of the instant Motion to Disqualify [DE 24, 39, & 47] and testimony and argument presented at a video motion hearing held before the undersigned on April 27, 2021 [DE 50]. Notably, Grand Design objected to some facts Mr. Fountain asserted during his testimony at the hearing as inadmissible hearsay. The undersigned sustained some of the objections and overruled others limiting Mr. Fountain's testimony to information presented strictly as evidence of Mr. Fountain's motive, intent, and reliance related to the communications at issue in this Motion. [*See, e.g.,* DE 51 at 43]. Accordingly, the facts presented here merely provide background for Mr. Fountain's conduct relevant to the instant Motion to

Disqualify and do not reflect any endorsement of the factual recitations by any party as to the merits of the claims and defenses in this case as a whole.

Grand Design filed its complaint in this action on January 11, 2021, alleging that Defendants infringed U.S. Patent No, 10,046,690 ("the '690 Patent") and U.S. Patent No. 10,654,398 ("the '398 Patent"), entitled Toy Hauler Recreational Vehicle. Grand Design submitted the application for the '690 Patent to the U.S. Patent and Trademark Office ("USPTO") on September 16, 2016. The '690 Patent names three inventors including Thomas Cramer. As a named inventor on the '690 Patent, Mr. Cramer is also associated with the subsequent '398 Patent, which issued from a continuation patent application.

Grand Design's September 16th application for the '690 Patent was seemed incomplete because it did not include the mandatory inventorship declarations. On September 28, 2016, the USPTO notified Grand Design that the application was incomplete and on October 14, 2016, Grand Design filed the omitted declarations, including one from Mr. Cramer, thereby completing its application for the '690 Patent.

In the meantime, Grand Design allegedly presented Mr. Cramer with both the application for the '690 Patent and a proposed "Confidentiality, Invention Disclosure and Intellectual Property Assignment and Waiver Agreement" simultaneously. Mr. Cramer discovered the invention in 2013, while employed as an engineer at Grand Design but on his own time. About that time, Mr. Cramer showed Grand Design's senior management fully enabling product drawings of the invention and was supposedly told that Grand Design was not interested in pursuing a patent for the

invention. Grand Design purportedly changed its mind after learning in early September 2016 that a competitor was using something similar.

Mr. Cramer and his wife Debra hired Mr. Fountain in September 2016 to advise them about the assignment/confidentiality agreement proposed by Grand Design.[1] Mr. Cramer evidently sought counsel because he knew that his employment was at risk for other reasons and wanted to protect all his interests as efficiently as he could. Mr. Fountain perceived Mr. Cramer as a prospective seller of IP and confidentiality rights and Grand Design as the prospective buyer of those rights.

On September 27, 2016, Mrs. Cramer emailed Mr. Fountain a copy of the proposed agreement Grand Design presented to Mr. Cramer. In advising the Cramers, Mr. Fountain analyzed whether Mr. Cramer had any preexisting obligations to Grand Design based upon any written or oral agreements, the nature of Mr. Cramer's job, and the normal course of dealing in the RV industry as to assignment and confidentiality. Mr. Fountain concluded that Mr. Cramer had no obligation to give ownership of his invention to Grand Design and had no duty of confidentiality to Grand Design. Mr. Fountain then worked with Mr. Cramer to understand his personal and professional goals and the value of his IP and confidentiality rights to inform Mr. Cramer's decision.

Mr. Fountain never participated in direct negotiations with Grand Design on Mr. Cramer's behalf. Mr. Cramer negotiated a revised agreement with Grand Design and on October 7, 2016, signed it, along with the other two inventors, thereby assigning "all

---

[1] Mr. Fountain reports that Mr. Cramer authorized him to disclose information related to the 2016 representation.

[their] rights, title and interest in and to the invention entitled **Toy Hauler Recreational Vehicle** . . . ." to Grand Design and agreeing to cooperate fully with patent prosecution proceedings as necessary. [DE 39-3]. No other IP rights were assigned to Grand Design and none of the proposed confidentiality terms were included in the final agreement.

With the agreement executed, Mr. Fountain's representation of the Cramers ended in mid-October 2016. Mr. Fountain's file related to his 2016 representation of the Cramers was destroyed in 2018 consistent with his normal business practice of destroying files two years after completion of his representation. Thus, Mr. Fountain has no contemporaneous notes of his 2016 representation of the Cramers. However, Mr. Fountain recalls that Mr. Cramer told him that he had communicated with Grand Design's counsel about the invention before becoming aware of Grand Design's application for the '690 Patent, before Grand Design sought assignment of Mr. Cramer's invention, and during the negotiations related to the assignment/confidentiality agreement. Mr. Fountain also states that he never helped Mr. Cramer or Grand Design get the invention patented. In fact, Mr. Fountain contends that Mr. Cramer never had any interest in patenting the invention and still does not.

In November 2018, Mr. Fountain was retained by Defendants related to a patent infringement dispute with Grand Design over the '690 and '398 Patents. Mr. Fountain then interviewed Mr. Cramer about the '398 Patent.[2] According to Mr. Fountain, Mr. Cramer indicated he was unaware of the '398 Patent until that point.

---

[2] The exact date of the interview is unclear. *Compare* DE 50 at 55 (Mr. Fountain testifying that he talked to Mr. Cramer, probably in 2019), *with* DE 1-2 at 2 (the '398 Patent, which is dated May 19, 2020).

In response to Grand Design's 2021 complaint, Mr. Fountain filed an answer and affirmative defenses on behalf of Defendants on February 2, 2021. [DE 11]. In support of an inequitable conduct affirmative defense, Defendants included two paragraphs that Mr. Fountain describes as "communication[s] between Mr. Cramer and Plaintiff's counsel when they were adversely situated and negotiating the 2016 Assignment." [DE 39 at 4]. Labeled "Item A," the first paragraph at issue describes a communication in which Mr. Cramer advised Grand Design of his opinion about the impact of relevant prior art on the '690 Patent.[3] Item B describes a communication that allegedly resulted in the scope of the '690 Patent application being crafted based on Mr. Cramer's opinion.

In support of another affirmative defense, Defendant included another two paragraphs that Mr. Fountain describes as "[c]ommunications between Mr. Cramer and Plaintiff's non-lawyer business managers." [*Id.*]. In Item C, Defendants alleges that "Prior to 2016, Mr. Cramer understood that Plaintiff did not desire to pursue his invention due to cost concerns." [*Id.*]. Item D is summarized as "Prior to 2016, Mr. Cramer understood that Plaintiff did not wish to patent inventions that could benefit the entire Recreational Vehicle industry." [*Id.*]

Before seeing Defendants' answer and affirmative defenses, Grand Design was unaware that Mr. Fountain knew of Mr. Cramer's communications with its counsel and senior management. Additionally, Grand Design did not know that Mr. Fountain

---

[3] To protect the allegedly privileged and confidential information from public disclosure, the Court merely summarizes the communications at issue, identified as Items A–D, consistent with Mr. Fountain's descriptions in his response brief. [*Compare* DE 39 at 4, *with* DE 11 at 31, ¶ 7.F; 32, ¶ 7.J; 35, ¶ 8.D; 36, ¶ 8.E].

interviewed Mr. Cramer about the patents at issue. Most concerning to Grand Design was that Items A–D included allegedly confidential and privileged information that Mr. Fountain never reported to Grand Design and that he apparently gleaned the information by interviewing its former employee, Mr. Cramer, without permission.

In response to this news, Grand Design sent a letter to Mr. Fountain on February 23, 2021[4], informing him that Mr. Cramer's conversations with Grand Design's counsel regarding his invention disclosures were privileged and instructing him to withdraw this information from the publicly-filed answer. [DE 24-2]. Grand Design also asked Mr. Fountain to explain how he obtained the information and what steps he had taken with it. A flurry of emails followed that in which Mr. Fountain objected to Grand Design's accusations without offering any explanation and then asked Grand Design about starting discovery immediately. [DE 24-3]. On March 9, 2021, Defendants noticed a Rule 30(b)(6) deposition of Grand Design for April 15, 2021. [DE 24-4]. Grand Design then filed the instant Motion to Disqualify on March 12, 2021.

## II.  ANALYSIS

"[D]isqualification [of an attorney] is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Bd. of Educ. of Lockport H.S.D. 205*, 17 F.3d 1059, 1066 (7th Cir. 1994). Disqualification deprives a party of their chosen representation thereby destroying the attorney-client relationship and

---

[4] On the same day, Grand Design filed a motion to strike Defendants' inequitable conduct affirmative defense that among other things, was based on the allegedly confidential and privileged information at issue here. [DE 16]. The Court denied Grand Design's motion to strike without prejudice as premature because Defendants had not been able to explore its theories through discovery. [DE 52].

disrupting litigation. *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 719 (7th Cir. 1982). In deciding a motion to disqualify, courts must carefully balance the public's interest in the sacrosanct privacy of the attorney-client relationship with each party's prerogative to proceed with counsel of its choice. *Cromley*, 17 F.3d at 1066. "A motion to disqualify counsel may sometimes be legitimate and necessary, but such motions should be viewed with extreme caution for they can be misused as techniques of harassment." *Tomasian v. C.D. Peacock, Inc.*, No. 09 C 5665, 2012 WL 2590493, at *4 (N.D. Ill. July 3, 2012) (internal quotations and citations omitted). Thus, "[t]he moving party bears a heavy burden of proving facts required for disqualification." *Id.* (internal quotation omitted). Nevertheless, a court should resolve doubts in favor of disqualification. *United States v. Goot*, 894 F.2d 231, 235 (7th Cir. 1990); *In re Neely*, No. 2:11-cv-140, 2012 WL 1714415, at *1 (N.D. Ind. May 14, 2012).

Grand Design's Motion to Disqualify is premised on allegations that Mr. Fountain deliberately, and inappropriately, obtained its privileged and confidential information from Mr. Cramer and then incorporated that information—as reflected in Items A–D—into Defendants' affirmative defenses. In support, Grand Design argues that Mr. Fountain violated ethical rules governing attorney conduct—namely Rule 1.9 regarding conflicts of interest; Rule 4.2 regarding attorney interactions with persons represented, or previously represented, by another attorney; and Rule 4.4 addressing an attorney's possession of an opposing party's privileged or confidential information.

Defendants and Mr. Fountain oppose Grand Design's Motion to Disqualify asserting that his conduct was not improper. Mr. Fountain admits that he conducted a

pre-suit investigation of Grand Design's patent infringement claims and that the investigation included interviews, including one of Mr. Cramer given his status as a named inventor and a former Grand Design employee. He contends that he did not induce disclosure of privileged information from Mr. Cramer and emphasizes that the information he received from Mr. Cramer, while representing him in 2016 and interviewing him related to this case, is neither privileged nor confidential.

## A.      Privilege

"The attorney-client privilege protects communications made in confidence by a client to his attorney in the attorney's professional capacity for the purpose of obtaining legal advice." *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007). The attorney-client privilege is intended "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The privilege protects the transmittal of professional legal advice and "the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390. The attorney-client privilege is, however, "an obstacle to the investigation of the truth [and should] be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Radiant Burners, Inc. v. Am. Gas Ass'n*, 320 F.2d 314, 323 (7th Cir. 1963) (internal quotations omitted). "The party claiming the privilege bears the burden of establishing that all of the requirements for invoking the attorney-client privilege are met." *Gingerich v. City of Elkhart Prob. Dep't*, 273 F.R.D. 532, 538 (N.D. Ind. 2011) (citing *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991)).

In the corporate context, the corporation is counsel's client, not any individual. *Upjohn*, 449 U.S. at 389–90. In *Upjohn*, communications between employees and corporate counsel were found privileged because they concerned matters in the scope of the employees' corporate duties, they were intended to secure legal advice for the corporation, and the employees knew they were helping counsel advise the corporation. *Id.* at 393. "Whether the attorney-client privilege applies should be determined on a case-by-case basis." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000) (citing *Upjohn*, 449 U.S. at 396). In the realm of patent law, communications from an inventor to counsel relating to "technical information," "prior art," or "patentability" issues arising from the preparation of a patent application are privileged. *Id.* at 806.

Here, Items A–D reflect the allegedly privileged information the Court must review. Items A and B undisputedly references communications between Mr. Cramer and Grand Design's counsel. [DE 39 at 4]. Items A and B also mention prior art in the context of the application for the '690 Patent suggesting that the topic of the communications between Mr. Cramer and Grand Design's counsel was patentability issues. [DE 11 at 31–32, ¶¶ 7.F, 7.J]. Thus, Grand Design understandably raises the question of whether Items A and B derived from privileged communications between Mr. Cramer and Grand Design's counsel.

Items C and D only reference communications between Mr. Cramer and Grand Design's senior management. [DE 39 at 4]. More specifically, Item C alleges that Grand Design informed Mr. Cramer that it lacked any interest in pursuing a patent for his

invention due to cost while Item D reflects a more general alleged statement to Mr. Cramer, and other employees, that Grand Design was not interested in pursuing patents that would protect the RV industry as a whole. Items C and D are not privileged because no attorney was involved in the conversations. *See Jenkins*, 487 F.3d at 490.

To determine whether the communications reflected in Items A and B are privileged, attention to whether an attorney-client relationship existed between Mr. Cramer and Grand Design's counsel at the time of the communications and the topics of those communications must be paid.

### A.    Applicable Law

As a preliminary matter, the Court must consider which circuit's laws apply to this privilege analysis. Grand Design wants the Court to apply only the Federal Circuit's law to these communications while Defendants argue that Seventh Circuit privilege law applies. Federal Circuit law applies when determining whether the attorney-client privilege attaches to a substantive patent issue while the law of the circuit in which the district court sits is applied with respect to nonpatent issues. *Spalding*, 203 F.3d at 803. In the Federal Circuit, communications between an inventor and their counsel about patentability, prior art, and technical information necessary for preparing a patent application are presumptively privileged. *Adv. Cardiovascular Sys. v. C.R. Bard*, 144 F.R.D. 372, 378 (N.D. Cal. 1992); *see also Spalding*, 203 F.3d at 806. However, assignments of IP rights, equated to licensing agreements, fall under contract law, not patent law, and are governed by the geographical circuit court. *Cf. In re Regents of the Univ. of Calif.*, 101 F.3d 1386, 1390 n.2 (Fed. Cir. 1996). Regardless of which

11

Circuit's law applies, the same basic analysis ensues—review each communication individually and determine whether it was "made [confidentially] by a client to an attorney for the purpose of obtaining legal advice or services." *Spalding*, 203 F.3d at 805 (citing *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997)); *see also Upjohn*, 449 U.S. at 396.

Here, the record lacks key facts relative to privilege no matter which Circuit's law is applied. First, Grand Design argues, in essence, that any communication between its counsel and Mr. Cramer about prior art and patentability of the '690 invention is privileged because of Mr. Cramer's status as a Grand Design employee. Yet Grand Design fails to establish that its counsel was representing Mr. Cramer at the time of those communications, that Mr. Cramer was communicating with Grand Design's counsel about matters within the scope of his employment, or that Mr. Cramer knew he was communicating with counsel to help Grand Design obtain legal advice about patenting of his invention. *See Upjohn*, 449 U.S. at 393. Grand Design could have called Mr. Cramer as a witness at this Court's motion hearing, submitted an affidavit from him, or asked to present testimonial or documentary evidence about Mr. Cramer's interactions with counsel to the Court *in camera*. It did not. As a result, the only evidence of record about the particulars of the relevant communications are from Mr. Fountain's hearing testimony.

Mr. Fountain positions the relevant communications in September 2016 as part of Grand Design's negotiations with Mr. Cramer about the proposed assignment/ confidentiality agreement. And nothing suggests that Mr. Cramer sought legal advice

from Grand Design's counsel on the assignment/confidentiality agreement. Instead, the record only shows that Mr. Cramer sought advice from Mr. Fountain about the agreement. According to Mr. Fountain, Mr. Cramer had no obligation to assign his invention to Grand Design or keep it confidential. He had discovered it in 2013 outside the scope of his employment and Grand Design rejected it. No one disputes that Mr. Cramer was not subject to any employment agreement, confidentiality agreement, or non-disclosure agreement that contractually obligated him to share his invention with Grand Design or otherwise maintain its confidences. Thus, Grand Design's counsel was not representing Mr. Cramer as to the assignment of his rights in the invention and the proposed confidentiality agreement. Mr. Cramer's interests were adverse to Grand Design's, and its counsel's, on those issues.

With that said, adversity can apply to some communications and not others. *Owens v. Best Beers of Bloomington*, 648 N.E.2d 699, 703 (Ind. Ct. App. 1995); *see also Spalding*, 203 F.3d at 805. Thus, communications between Mr. Cramer and Grand Design's counsel that implicated substantive patent issues may still be privileged if an attorney-client relationship existed between them at the time of the communication and the patent-related communications were made in confidence.

The facts are clear that in September 2016, Grand Design's counsel was preparing a patent application for their client, Grand Design, and needed an inventor disclosure from Mr. Cramer to prosecute the patent application. *See* 35 U.S.C. § 112(b). However, the record includes nothing from which to determine whether Grand Design's counsel informed Mr. Cramer at any time that his communications were being used to advise

13

Grand Design about the patent application. Unfortunately, Mr. Fountain's testimony is not particularly helpful in clarifying the circumstances of Mr. Cramer's communications with Grand Design's counsel either.

Mr. Fountain first testified that he believes that Grand Design's counsel gave Mr. Cramer both a draft of the application for the '690 Patent and the proposed assignment/confidentiality agreement in mid-September, around the time Grand Design filed the patent application. [DE 51 at 39, 41–42, 44]. From this statement, one might infer that Mr. Cramer shared information about patentability with Grand Design's counsel while negotiating the assignment of his invention for which Grand Design was pursuing a patent. Mr. Fountain stated just that later when he testified:

> Tom owned the inventions [at the time of the communications], and he was not seeking to patent them. [Further,] Tom was communicating information about what he thought the scope of his invention was to the other side [Grand Design] with respect to a valuation/suitability/interest in acquiring sort. He was not seeking legal advice. He was providing information with regard to whether they were going to buy it or not.

[*Id.* at 58].

But then, in answering questions about the timeline of Mr. Cramer's communications with Grand Design's counsel, Mr. Fountain also testified that Mr. Cramer told him he communicated with Grand Design's patent counsel about his invention "prior to the patent application draft and during negotiations." [*Id.* at 50]. Mr. Fountain then confirmed that Mr. Cramer told him during the course of the 2016 representation, and at other times too, "that he had communications with Grand Design's counsel before they sought an assignment of his invention or outside the scope

14

of those assignment proceedings." [*Id*. at 51]. This testimony creates a competing inference that Mr. Cramer—as a Grand Design employee—was discussing technical information about his invention with Grand Design's counsel for the purpose of preparing the patent application completely separate from his negotiations reflecting his personal interests in the proposed assignment/confidentiality agreement. When specifically asked, however, whether Mr. Cramer told him that he had "a discussion with Grand Design counsel in 2016, or any time before that, about them seeking a patent for his idea," Mr. Fountain responded that Mr. Cramer "said what he was doing, but I'm not sure he said what they [Grand Design] were doing." [*Id.* at 53].

Faced with these competing inferences, the Court is left to guess as to the timing, purpose, substance, and circumstance of Mr. Cramer's communications with Grand Design's counsel. Without any further evidence from Mr. Cramer himself or Grand Design, it is impossible to determine if Mr. Cramer's knew his opinion was being sought from him as a Grand Design employee to help counsel give Grand Design—the client—legal advice. *See Upjohn*, 449 U.S. at 393; *see also Tomasian*, 2012 WL 2590493, at *4. Similarly, Grand Design has not shown that its corporation-counsel relationship with Grand Design somehow translated into an inventor-counsel relationship with Mr. Cramer. *See Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 278 F.3d 1288, 1304 (Fed. Cir. 2002) (noting that "it was the corporation-counsel relationship that was the basis for the attorney-client privilege in *In re Spalding Sports*, not the inventor-counsel relationship.").

Without more, Grand Design has not shown that the communications referenced in Items A and B were made in the context of an attorney-client relationship and were

made in confidence. Therefore, Grand Design has not met its burden to establish that the relevant September 2016 communications between Mr. Cramer and Grand Design's counsel were privileged. *See Gingerich*, 273 F.R.D. at 538 (citing *White*, 950 F.2d at 430). Yet the question remains as to whether any of the information referenced in Items A–D is otherwise confidential.

### B.     Otherwise Confidential Information

Principles of agency establish a "common law duty [that] obligates an employee to protect any confidential information entrusted to him by his employer during his employment . . . . and after his termination" regardless of any contractual agreement to do so. *Overwell Harvest Ltd. v. Widerhorn*, No. 17 C 6086, 2021 WL 5049777, at *7 (N.D. Ill. Nov. 1, 2021) (quoting *S.E.C. v. Cherif*, 933 F.2d 403, 411 (7th Cir. 1991) (citing Restatement (Second) of Agency § 395 (Am. L. Inst. 1958))). Grand Design argues that Mr. Cramer was bound by that duty of confidentiality as an employee and former employee. Mr. Fountain disagrees contending that if Mr. Cramer was bound by such a duty, which undisputedly was not documented in any written or oral employment-related agreement, Grand Design would not have been pursuing a confidentiality agreement with Mr. Cramer in 2016 with retroactivity language that would have captured Mr. Cramer's communications reflected in Items A–D. [DE 51 at 59–60]. Defendants also note that the assignment agreement Mr. Cramer ultimately signed in October 2016 included no confidentiality provisions. The parties, however, fail to present sufficient legal authority to support any finding as to the confidentiality of the information in Items A–D disclosed to Mr. Fountain by Mr. Cramer.

16

Presumably, much of what Mr. Cramer discussed with Grand Design's counsel or senior management about the prosecution of a patent for his invention, and any business decisions related to it, is confidential information gleaned within the scope of his employment. Yet interestingly, authority cited by Grand Design includes no examples of cases enforcing the common law duty of confidentiality absent some other contractual obligation to do so.[5] Grand Design simply cites cases that address the ethical obligations of parties who receive privileged or confidential information without any analysis of the confidentiality of the information. *See, e.g., Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Trust Fund*, 17 C 6473, 2019 WL 447622, at *5 (N.D. Ill. Feb. 5, 2019) ("[I]t is generally an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party.") (quoting *Chamberlain Grp., Inc. v. Lear Corp.*, 270 F.R.D. 392, 398 (N.D. Ill. 2010)); *see also Burt Hill, Inc. v. Hassan*, No. Civ.A. 09-1285, 2010 WL 419433 (W.D. Pa. Jan. 29, 2010); *Taylor v. Cook Cnty. Sheriff's Office*, Case No. 13-cv-1856, 2020 WL 1047053 (N.D. Ill Mar. 4, 2020). Defendants cite no useful authority to guide an analysis of whether the information reported in Items A–D is confidential or not.

Asserting without support that Items C and D are confidential, Grand Design contends that they are also privileged citing *Hill-Rom Servs., Inc. v. Tellisense Med., LLC,*

---

[5] Similarly, the Court's own research did not reveal cases enforcing the common law duty of confidentiality absent an employment agreement, corporate policy manual, nondisclosure agreement, or non-compete agreement. *Comare Cherif*, 933 F.2d at 411 ("integrity policy" and common law duty), *with PRG-Schultz Int'l, Inc. v. Kirix Corp.*, No. 03 C 1867, 2003 WL 22232771 (N.D. Ill. Sept. 22, 2003) (employment handbook); *Overwell*, 2021 WL 5049777, at *2 (non-disclosure and restrictive covenant provisions of employee agreement).

No. 1:17-cv-04725-WTL-MJD, 2019 WL 10888530, at *3 (S.D. Ind. May 13, 2019). In *Hill-Rom*, the court addressed a motion to compel production of draft patent applications withheld "on the basis of attorney-client privilege because the documents were never sent to an attorney for the privilege to attach." *Id.* at *2. Grand Design likens Mr. Cramer's presentation of "fully enabling product drawings" related to his invention to senior management to the *Hill-Rom* draft patent applications and argues Items C and D are therefore privileged. Yet, the *Hill-Rom* court only protected the documents at issue after finding they "were created for the purpose of seeking legal advice and ultimately were confidentially sent to counsel." *Id.* at *4.

Grand Design embraces an inference that Mr. Cramer approached senior management seeking legal advice about the patentability of his invention, but the record is not quite that clear. Items C and D allege what sounds more like a business policy about Grand Design's approach to patents than any communication about the patentability of Mr. Cramer's invention. Additionally, Grand Design concludes that the information in Items C and D was ultimately conveyed to Grand Design's counsel based solely on Defendants' statement describing Item B that "the patent application [was] crafted based on Mr. Cramer's opinion" of the invention. [DE 47 at at 16 (citing DE 39 at 4)]. Yet Grand Design does not connect Mr. Cramer's "opinion" to Items C or D. Thus, *Hill-Rom* is distinguishable from the facts available to the Court here.

With that said, common sense and logic dictate that communications between any individual and an attorney or an employee and senior managers at his employer corporation could contain privileged or confidential information. The ethics antenna of

any licensed attorney should alert when hearing about such communications from a client or anyone.

###   C.      Ethical Obligations

Despite Grand Design's failure to show that any of the information in Items A–D are either privileged or confidential, it still argues that Mr. Fountain violated rules of professional conduct governing attorney conduct—specifically the handling of privileged or confidential information, interviewing an opposing party's former employee, and litigating the invalidity of patent whose named inventor is a former client. Indeed, the rules of professional conduct and the "Court's inherent power, authority, and duty to ensure the administration of justice and the integrity of the litigation process," prohibit an attorney from obtaining and using information protected by the attorney-client privilege or otherwise confidential information belonging to a company outside the protections of the discovery process. *Arnold v. Cargill, Inc.*, No. 01-2086 (SWF/AJB), 2004 WL 2203410, at *6 (D. Minn. Sept. 24, 2004). Moreover, the law limits an attorney's communications with an opposing party's former employees to non-confidential and non-privileged information. *Taylor*, 2020 WL 1047053, at *2; *see also Harris Davis Rebar*, 2019 WL 447622, at *6 (discussing ABA Model Rules 4.2 and 4.4(b)).

To protect privileged and confidential information, "[a]n attorney who receives privileged documents has an ethical duty to cease review of the documents, notify the privilege holder, and return the documents." *Arnold*, 2004 WL 2203410, at *10. These obligations extend to proprietary and confidential information as well. *Burt Hill, Inc.*, 2010 WL 419433, at *8 n.11. Accordingly, it is not appropriate for lawyers to unilaterally

determine whether particular information is privileged or confidential—that is ultimately a call for the court to make. *Harris Davis Rebar*, 2019 WL 447622, at *6.

According to Mr. Fountain, he conducted a privilege and confidentiality check on the information Mr. Cramer was sharing with him in 2016. From there, it is easy to infer that Mr. Fountain recognized that Mr. Cramer was sharing potentially privileged and confidential information with him and did not intentionally disregard it. Yet Mr. Fountain's conduct surrounding receipt of the Cramer/Grand Design communications still displays some questionable decisionmaking. Upon first learning of any communication between Mr. Cramer and Grand Design's counsel or senior management, Mr. Fountain should have stopped Mr. Cramer from sharing more until Grand Design's counsel was made aware of the possible disclosure and could assess the protectability of the relevant information. Mr. Fountain's choice to accept all the information without at least alerting Grand Design certainly raises suspicions of an ulterior motive, even if the information was deemed not to be privileged or confidential. *See id.* at *4 ("[ABA Model Rule] 4.4 . . . deals with an attorney's duties with respect to the rights of third persons."). After all, Grand Design has yet to establish the privileged and confidential nature of the information reflected in Items A–D.

Grand Design also argues Mr. Fountain is now violating Rule 1.9 of the Indiana Rules of Professional Conduct by representing Defendants in this action. More specifically, Grand Design contends that Mr. Fountain is attacking the validity of the '690 Patent on behalf of Defendants here while his former client, Mr. Cramer, has an interest in preserving the patent as a named inventor.

20

Ind. R. Prof'l Conduct 1.9 prohibits representation of a client "in the same or a substantially related matter in which [the client's] interests are materially adverse to the interests of [a] former client unless the former client gives informed consent, confirmed in writing." According to the Seventh Circuit,

> [I]t is clear that the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought. The rule thus does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed.

*Hobson v. Trans Union, LLC,* No. 1:13-CV-54, 2013 WL 2443917, at *2 (N.D. Ind. June 5, 2013) (quoting *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 (7th Cir. 1978)).

Defendants are undeniably arguing the invalidity of the same '690 Patent that was the subject of Mr. Cramer's assignment agreement in 2016 and names Mr. Cramer as an inventor. A conflict of interest only arises, however, if there is a substantial relationship between the two representations and Mr. Cramer's interests are materially adverse to Defendants'. Understandably, the Federal Circuit has stated:

> [W]e do not believe any court would hold that it is within the bounds of propriety to permit a law firm to assist a client in obtaining a patent which was equitably owned by another and then to lead the attack against the patent's validity once it is transferred to its rightful owner.

*Sun Studs v. Applied Theory Assocs.*, 772 F.2d 1557, 1567 (Fed. Cir. 1985). Yet the record shows that Mr. Fountain did not represent Mr. Cramer for the purpose of obtaining a patent for his invention. According to Mr. Fountain, Mr. Cramer was never interested in pursuing a patent for his invention and is not interested in protecting the patent even now. Thus, the record does not show the necessary material adversity.

Grand Design contends that Mr. Cramer's reputational interest in the '690 Patent as a named inventor creates material adversity to Defendants' efforts, with Mr. Fountain's help, to invalidate the '690 Patent. No doubt an inventor has a reputational interest in patents related to his inventions. *See Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663–66 (Fed. Cir. 2015). But the effect of disputed patents on an inventor's reputation is a factual question. *Id.* (finding genuine disputes of material fact related to the inventor's reputation that precluded summary judgment on an inventor's claim for correction of inventorship of disputed patents). Review of the limited facts available here—including Mr. Cramer's awareness of Mr. Fountain's representation of Defendants and his lack of objection—demonstrates that Mr. Cramer is not concerned about any reputational interest he may have in the patent. As Mr. Fountain testified, Defendants' interest in invalidating the '690 is congruent with Mr. Cramer's interests rather than adverse. Thus, Rule 1.9 is not implicated by Mr. Fountain's representation of Defendants.

### D. Disqualification and Other Sanctions

Unable to conclude that Items A–D include privileged or confidential information or that Mr. Fountain overstepped ethical boundaries, the Court is still concerned about Mr. Fountain's conduct in this litigation. The record paints a picture of

an attorney interpreting the applicable federal and local rules of procedure, as well as the rules of professional conduct, extremely narrowly so as to walk right up to the line of propriety, not quite cross that line, and use borderline litigation strategies to his clients'—or his own—benefit. This is not new behavior for Mr. Fountain.

In another patent case before this Court, Mr. Fountain engaged in what the presiding judge described as "unconventional litigation techniques." *Lippert Components Mfg., Inc. v. MOR/ryde Int'l, Inc.*, 2017 WL 4771010, at *1 (N.D. Ind. Feb. 23, 2017). In that order, the Court affirmed sanctions against Mr. Fountain's former clients—the defendants—based largely on Mr. Fountain's unsuccessful attempt to circumvent the local patent rules. *Id.* at *3–*4. Earlier in that case, Mr. Fountain had also continued to pursue a defense that was stricken by the Court as "baseless and precluded by binding authority." *Lippert Components Mfg., Inc. v. MOR/ryde Int'l, Inc.*, Case No. 3:14-CV-1999 JD, 2016 WL 9954302, at *4 (N.D. Ind. May 20, 2016). Finding that conduct "objectively unreasonable," the Court imposed sanctions upon Mr. Fountain personally. *Id.*

Here, however, Grand Design has not met its burden to present sufficient facts to justify disqualification of Defendants' counsel. *See Tomasian*, 2012 WL 2590493, at *4. The record does not, as presented, establish that the Cramer/Grand Design communications at issue in Items A–D are privileged or confidential. And while Mr. Fountain's conduct treads close to the ethical lines demarcated to curb attorney behavior, the record does not reflect clear ethical violations or even reckless conduct. Moreover, Mr. Fountain has testified under oath that he intentionally researched and assessed the ethical and legal implications of his interactions with Mr. Cramer and his

handling of the Cramer/Grand Design communications divulged to him. *Cf. Harris Davis Rebar*, 2019 WL 447622, at *7. And while Mr. Fountain's record of sanctions in *Lippert* may be noteworthy given some of the similar approaches Mr. Fountain appears to be taking in this case, it is not a disciplinary history of such magnitude that it overrides the facts in the record of this case. Thus, disqualification is not absolutely necessary. *Crowley*, 17 F.3d at 1066.

Nevertheless, lesser sanctions are needed here to protect the integrity of this proceeding and deter future misconduct. Grand Design's requests to strike Defendants' relevant affirmative defenses and prohibit Defendants and their counsel from contacting Mr. Fountain's sources of information reflected in Items A–D and using them as witnesses are excessive and unnecessarily punitive based upon the record before the Court. Thus, the undersigned recommends that only the paragraphs including Items A–D be stricken. Mr. Cramer, or any other sources of information in Items A–D, may be utilized as witnesses in this patent infringement action but Defendants and their counsel cannot elicit evidence or testimony from them about communications with Grand Design's counsel or senior management. Any objections to evidence or testimony from any of the relevant sources may be raised to the Court in the course of discovery or other proceedings before this Court. Lastly, the parties shall cover their own costs for the litigation of Grand Design's motion to disqualify.

III. **CONCLUSION**

For the reasons discussed above, Grand Design's Motion to Disqualify is **DENIED** as to its requests for (1) disqualification and (2) reimbursement of expenses

related to this Motion. [DE 24]. As detailed above, Grand Design's Motion is also

**GRANTED IN PART** as to its request to prohibit use of Mr. Fountain's sources for

Items A–D as witnesses. [DE 24].

 The undersigned further **RECOMMENDS** that the Court **GRANT IN PART**

Grand Design's Motion as to its request to strike Defendants' relevant affirmative

defenses. [DE 24]. The undersigned **RECOMMENDS** that the paragraphs incorporating

Items A–D be **STRICKEN**. [DE 11 at 31, ¶ 7.F; 32, ¶ 7.J; 35, ¶ 8.D; 36, ¶ 8.E]. If this

recommendation is approved, the undersigned also **RECOMMENDS** that the Clerk be

directed to seal Defendants' answer [DE 11] and that Defendants be afforded three days

to file a redacted version of their answer and affirmative defenses to clarify the record.

 With regard to only this referred portion of Grand Design's Motion to Disqualify,

  **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being
served with a copy of this recommended disposition a party may serve
and file specific, written objections to the proposed findings and/or
recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE
OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT
TO APPEAL THE DISTRICT COURT'S ORDER.**

 Lastly, Grand Design's uncontested[6] Motion to Seal portions of its Motion to

Disqualify is **GRANTED**. [DE 25]. The Clerk is **DIRECTED** to maintain the unredacted

version of Grand Design's Motion [DE 24] under seal.

 **SO ORDERED** this 28th day of March 2022.

s/Michael G. Gotsch, Sr.   
Michael G. Gotsch, Sr.
United States Magistrate Judge

---

[6] Defendants filed no response to Grand Design's Motion to Seal. *See* N.D. Ind. L.R. 7-1(d)(3)(A).